**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| ZIPIT WIRELESS, INC., | |
| Plaintiff, | |
| v. | Civil Action No. _____ |
| LG ELECTRONICS U.S.A., INC. | **JURY TRIAL DEMANDED** |
| Defendant. | |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff, Zipit Wireless, Inc., for its Complaint against Defendant LG Electronics U.S.A., Inc., alleges as follows:

**INTRODUCTION**

1.     This is an action for patent infringement arising under the patent laws of the United States, Title 35, United States Code.

**THE PARTIES**

2.     Plaintiff, Zipit Wireless, Inc. (hereinafter "Zipit") is a Delaware Corporation with a principal place of business located at 101 North Main Street, Suite 201, Greenville, South Carolina 29601.

3.     On information and belief, Defendant LG Electronics U.S.A., Inc. ("LGEUS") is a Delaware Corporation with its principal place of business at 910 Sylvan Avenue, Englewood Cliffs, New Jersey, 07632.

4.      On July 23, 2018, Zipit sued LGEUS's parent company, LG Electronics, Inc. ("LGEKR"), in the District of South Carolina for infringement of U.S. Patent No. 7,292,870 and U.S. Patent No. 7,894,837.  LGEKR moved to dismiss Zipit's complaint for lack of personal jurisdiction or, alternatively, to transfer the case to the Northern District of California (despite having no offices there).  The South Carolina court denied LGEKR's motions without prejudice, granting LGEKR leave to refile its motion after the parties conducted jurisdictional discovery. In its reply brief in support of its motion, LGEKR stated that LGEUS is the "true defendant in this case," and that New Jersey is a proper venue given that LGEUS is headquartered in this District.  *Zipit Wireless, Inc. v. LG Electronics, Inc.,* No. 6:18-cv-02016-JMC (D.S.C.), Dkt. 46 at 8 n.4.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over all causes of action set forth herein pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, Title 35, United States Code, including 35 U.S.C. §271 *et seq*.

6.      LGEUS is in the business of supplying instant messaging devices, such as smartphones, in the United States.

7.      LGEUS has solicited business in the State of New Jersey, transacted business within the State of New Jersey and attempted to derive financial benefit from residents of the State of New Jersey, including benefits directly related to the instant patent infringement cause of action set forth herein.

8.      LGEUS has made, used, sold, offered for sale, and/or imported mobile phones and/or has placed such phones into the stream of commerce, which phones have been offered for sale, sold, and/or used in the State of New Jersey and this judicial district.

9.      At the time of filing of this Complaint, LGEUS's smartphones are available for purchase by consumers in the State of New Jersey, including within this judicial district.

10.     On information and belief, LGEUS has made, used, sold, offered for sale, and/or imported wireless mobile communication devices that are alleged herein to infringe one or more of the patents set forth herein, and/or has placed such devices into the stream of commerce, which devices have been made, offered for sale, sold, and/or used in the State of New Jersey and within this judicial district.

11.     LGEUS sells products in this judicial district that are accused of infringement in this Complaint.

12.     LGEUS is subject to personal jurisdiction in the State of New Jersey and in this judicial district.

13.     LGEUS is subject to personal jurisdiction in the State of New Jersey by virtue of the fact that its headquarters and its principal place of business are located in the State of New Jersey.  LGEUS is also subject to personal jurisdiction under the provisions of the New Jersey Long Arm Statute by virtue of the fact that, upon information and belief, LGEUS has availed itself of the privilege of conducting and soliciting business within this State, including engaging in at least some of the infringing activities in this State, as well as by others acting as LGEUS's agents and/or representatives, such that it would be reasonable for this Court to exercise

jurisdiction consistent with principles underlying the U.S. Constitution, and the exercise of jurisdiction by this Court would not offend traditional notions of fair play and substantial justice.

14.     On information and belief, LGEUS has also established minimum contacts with this judicial district and regularly transacts and does business within this district, including advertising, promoting and selling products over the Internet, through intermediaries, representatives and/or agents located within this judicial district, that infringe Plaintiff Zipit's patents, which products are then sold and/or shipped directly to citizens residing within this State and in this judicial district.  Upon further information and belief, LGEUS has purposefully directed activities at citizens of this State including those located within this judicial district.

15.     On information and belief, LGEUS has purposefully and voluntarily placed its products into the stream of commerce with the expectation that they will be purchased and used by customers located in the State of New Jersey.  On information and belief, LGEUS's customers in the State of New Jersey have purchased and used and continue to purchase and use LGEUS's products.

16.     This Court has personal jurisdiction over Defendant under the long arm statute of the State of New Jersey because: (i) Defendant has and continues to intentionally sell products and methods, including the infringing methods, to customers in New Jersey; (ii) Defendant has and continues to intentionally instruct customers and potential customers in New Jersey with respect to how to use the products and methods that Defendant sells to customers in New Jersey; (iii) Defendant knows and has known its products and methods, including the infringing methods, have and continue to be sold and marketed in New Jersey; (iv) Defendant knows and has known that its manufactured products and methods will enter the United States of America and the State of New

Jersey; (v) Defendant has and continues to target customers and potential customers in New Jersey to buy and/or use Defendant's products and methods, including the infringing methods; (vi) Defendant has and continues to provide advice to customers in New Jersey; (vii) it has been and continues to be foreseeable that Defendant's products and methods, including the infringing methods, would enter the State New Jersey; (viii) Defendant has and continues to market to citizens of New Jersey through its website www.lg.com/us, which is copyrighted 2009-2020 by LG Electronics; (ix) Defendant has and continues to provide services to citizens of New Jersey through its through website; (x) Defendant derives substantial revenue from New Jersey; (xi) New Jersey has and continues to be part of Defendant's established distribution channels; (xii) the assertion of personal jurisdiction over Defendant is reasonable and fair; (xiii) and the State of New Jersey has an interest in this matter due to the presence of Defendant's products and methods, including the infringing methods, in the State of New Jersey.

17.     This Court also has personal jurisdiction over Defendant as: (i) Defendant maintains a regular and established place of business, its headquarters, in the State of New Jersey; (ii) Defendant transacts business in the State of New Jersey; (iii) Defendant maintains regular and systematic business contacts with the State of New Jersey and within this judicial district and division; (iv) Defendant purposely, regularly, and continuously conducts business in the State of New Jersey and within this judicial district and division; (v) Defendant knowingly places its infringing products in the stream of commerce knowing, expecting, and intending for its infringing products to be offered for sale, sold, purchased, and used by residents of State of New Jersey and within this judicial district and division; (vi) Defendant knowingly places its infringing products in the stream of commerce knowing, expecting, and intending for materials supporting it infringing

products, such as user manuals and product support literature, to be offered for sale, sold, purchased, and used by residents of State of New Jersey and within this judicial district and division; (vii) Defendant purposefully directs its activities at residents of the State of New Jersey; (viii) the cause of action set forth herein arises out of or relates to the Defendant's activities in the State of New Jersey; and (ix) the exercise of jurisdiction over Defendant will not offend the traditional notions of fair play and substantial justice.

18.     Venue is proper in this judicial district and division pursuant to 28 U.S.C. §1331, §1338(a), and §1400(b) at least because Defendant has committed acts of infringement and has a regular and established place of business in the District of New Jersey.

## BACKGROUND

## Zipit's Technology

19.     Zipit has and continues to offer for sale Wi-Fi based instant messaging solutions. Zipit's first product, the Zipit Wireless Messenger:



was introduced in 2004 and was sold through major retailers including Target, Best Buy, Radio

Shack, and Amazon and received press coverage in the Chicago Tribune, the New York Times,

and many media outlets, as shown in Exhibit "G."

20.     In 2007, Zipit introduced its second-generation Wi-Fi based instant messaging

device known as "Z2":



21.     In 2011, Zipit launched an enterprise messaging solution in conjunction with a

major U.S. cellular carrier and is actively selling this solution into healthcare, hospitality, ems,

manufacturing, utility, and government accounts.  Zipit's solution has been deployed in over 250

enterprise customers across the U.S. and Zipit's customer base continues to grow monthly.

### Zipit's Awards And Notoriety

22.     In 2005, *Time Magazine* awarded Zipit's first Wi-Fi instant messaging device

("Zippy") Time's "The Most Amazing Inventions of 2005" Award:



To determine the award winners, Time Magazine "spent more than six months surveying fields as diverse as electronics, aeronautics, medical technology, sports equipment, toys, clothing and food looking for the newest-and most inspired-ideas of the year."  Exhibit "G."

23.    Zipit's "Zippy" instant messaging device also won an award from iParenting Media in 2006.  Exhibit "G."

24.    Zipit's "Zippy" Wi-Fi instant messaging device also received praise and acclaim in media across the United States and the World in at least the Chicago Tribune "Zipit is king of messengers" (March 3, 2005); the New York Times "Making an Easy Task, Instant Messaging, Even Easier." (March 10, 2005); the New York Times "Making an Easy Task, Instant Messaging, Even Easier." (March 21, 2005) (Online Edition); the Austin American-Statesman "Gadgets: … Instant messaging with no extra charges" (March 21, 2005); ABC12.com "Zipit Wireless Messenger" (Aug. 15, 2005); ABC12.com "Zipit Wireless Messenger" (Aug. 22, 2005); The Greenville News (Dec. 5, 2004); Parade "a brilliant little device" (April 24, 2005);

8

Univision.com; ym.com "What's Hot: March 15, 2005" (March 17, 2005); Gizmodo "Perfect for

the IM addict" (July 19, 2005); Gizmodo "Teacher's Worst Nightmare - Aeronix ZipIt" (Sept.

29, 2005); HeraldToday.com ("Zipit rules wireless messenging world") (March 10, 2005); HUB:

Digital Living (March 2005); New York Daily News "Hot, hotter, hottest The Definitive guide to

who and what is sexy right now" "Gadgets" (April 3, 2005); and the St. Petersburg Times "2005

Annual Gadget Guide From Apple to Zipit" "For the good times" (Nov. 28, 2005).  Exhibit "G."

     25.     Zipit's second version of its Wi-Fi instant messaging device, "Z2," also was

widely praised and acclaimed.  In 2007, PC Magazine awarded Zipit's "Z2" the "Winner" of its

"Best of Show" award at the Digital Life show in the category of "Portable Gear."  Zipit's "Z2"

also won another award from iParenting Media in 2008.  Exhibit "G."

     26.     Zipit's "Z2" Wi-Fi instant messaging device, also was praised in at least the

following media sources: PC Magazine DigitalLife 2007 "Best of Show" (Sept. 28, 2007);

DigitalLife's "Best of Show Award" (Oct. 2, 2007); 2013 iParenting Media Awards – Winner –

Zipit Wireless Messenger 2 (April 30, 2008); 2014, Video – Z2 Highlight Reel (The Today

Show; USA Today; Associated Press Article; The Washington Post; The Boston Globe; Houston

Chronicle; The Philadelphia Inquirer; The Kansas City Star; The Miami Herald; San Francisco

Chronicle; Orlando Sentinel; Rocky Mountain News; ABC Television Channel 7; CNN

Television; FOX News FOX & Friends; The New York Times; Pittsburgh Post-Gazette; MTV

Television; Yahoo! Tech; CNET; eva; The Montel Williams Television Show; NBC Channel 5;

LINUX Journal; WNN Wi-Fi News; Digital Tech News'; Wireless Week; electronista; I40

News; Best stuff; FOX & Friends (2015); The Montel Williams Show (Dec. 6, 2006; WABC –

New York Channel 7 (Dec. 17, 2006); FOX Business (March 19, 2008); The Today Show (Jan.

6, 2008);  MTV; The Detroit News – "In our opinion - Zipit Z2 perfect for kids" (June 30, 2008);

the Akron Beacon, Ohio.com (April 14, 2008); the Arizona Star (April 3, 2008); the

BaltimoreSun.com (April 17, 2008); The Record NorthJersey.com "Kids and their parents will

love the Z2 messaging device" (April 12, 2008); TheStreet.com "Instant Messaging With Mass

Appeal" (Dec. 7, 2007); Digital Life "Digital Life Announces the Digital Life Innovators Class

of 2007" (Sept. 24, 2007); E-Gear "Is Anybody Out There" (April 9, 2008); Gizmodo "Zipit Z2

Wireless Messenger Lets Teens IM For Free" (Nov. 7, 2007); GoErie.com " Txt all d tym" "IM

friends without tying up computer" (April 11, 2008); CBS4Denver.com "One of the best

products for teens, tweens and their parents" (2007); InfoSyncWorld.com "Zipit Z2 Wireless

Messenger sends IMs without PC or phone" "it has a dedicated smiley button, which we have

never seen before, but now we want on our Treo :-)" (Nov. 7, 2007); InsignifacantThoughts.com

(Sept. 28, 2007); KansasCity.com "Better Messages" (Dec. 6, 2007); LinuxDevices.com (Nov. 9,

2007); MiamiHerald.com (Oct. 18, 2007); ny1.com (Sept. 27, 2007); NYTimes.com (Oct. 4,

2007); PCMag.com.br (Sept. 28, 2007); PC.Watch.Impress.co.JP (Dec. 9, 2007); Yahoo! News

(Sept. 27, 2007); Register Hardware UK (Nov. 7, 2007); SlashGear.com (Sept. 27, 2007);

StarTelegram.com "High-tech hobbies" (Oct. 14, 2007); the Minneapolis StarTribune.com (Oct.

8, 2007); DailyHerald.com (June 23, 2008); The Gazette Canada.com (Oct. 11, 2007);

TheStreet.com "Instant Messenger With Mass Appeal" "a must-have for travelers" (Dec. 7

2007); TimeforKids.com (Nov. 26, 2007); Twice.com (Sept. 27, 2007); ABCNews.com (Nov. 2,

2007); ABCNews: The Ultimate Gift Guide (Nov. 8, 2007); Adweek Magazine "Top 10 Trends

of 2007" (Dec. 17, 2007); BlogStuff.com (Nov. 26, 2007); Blog-SciFi.com (Sept. 27, 2007);

10

Brighthand.com (Sept. 30, 2007); CBS Tech Toys Review (Oct. 16, 2007); and The Charlotte

Observer Charlotte.com (Oct. 21, 2007).  Exhibit "G."

## Wi-Fi Instant Messaging Devices With Emoticons Drive Purchasing Decisions

27.     Prior to the existence of Wi-Fi instant messaging, carriers typically charged up to

$0.20 per text, or $20.00 per month for unlimited texting.  Thanks to Wi-Fi based instant

messaging, however, consumers no longer had to pay for individual instant messages or monthly

service plans.  As a result, by 2016, it was estimated that consumers saved $54 billion

($54,000,000,000) through the use of Wi-Fi instant messaging instead of from SMS-based

instant messaging.

28.     Instant messaging has been and continues to be the single most important

smartphone feature.  Indeed, many potential customers are unlikely to purchase a smartphone

that is not able to generate an instant message comprising an emoji / graphical symbol (☺, ☹)

that is sent over Wi-Fi.

29.     Using a handheld device, such as a smartphone, to send instant messages that

contain emojis is a major and growing form of communication among an incredibly large

demographic.  Indeed, this is reflected by Oxford Dictionary's "word" of the year for 2015,

which was the "face with tears of joy" emoji:



Oxford Dictionary selected the emoji as its "word" of the year because the emoji was "the 'word'

that best reflected the ethos, mood, and preoccupations of 2015."  It is further reflected by the

11

creation of "World Emoji Day," which is held annually on July 17.

## ZIPIT'S PATENTS

30.     The United States Patent and Trademark Office awarded Zipit two patents on its highly acclaimed "Instant Messaging Terminal Adapted For Wi-Fi Access Points," U.S. Patent No. 7,292,870 and U.S. Patent No. 7,894,837.

### Zipit's U.S. Patent No. 7,292,870

31.     On November 6, 2007, the United States Patent and Trademark Office duly and legally issued United States Patent No. 7,292,870, entitled "Instant Messaging Terminal Adapted For WI-FI Access Points."  A true and correct copy of U.S. Patent No. 7,292,870 is attached hereto as Exhibit "A."

32.     Zipit is the owner, by assignment, of all right, title, and interest in and to U.S. Patent No. 7,292,870 (hereinafter the "'870 Patent"), including the right to sue for past, present, and future patent infringement, and to collect past, present, and future damages.

33.     The '870 patent complies with the Patent Act, including 35 U.S.C. §101, 35 U.S.C. §102, 35 U.S.C. § 103, and 35 U.S.C. §112.  Exhibit "B."

34.     On July 16, 2013, the Patent Office issued a Certificate of Correction for the '870 patent.  Exhibit "C."

35.     Each and every claim of the '870 patent is valid and enforceable.

36.     The '870 patent and its claims are entitled to the benefit of the date upon which Zipit filed its provisional patent application 60/532,000, which was filed on December 24, 2003.  Exhibit "D."

12

37.     As the invention(s) claimed in the '870 patent were conceived no later than April 2003, the claims of the '870 patent are further entitled to a priority date of no later than April 2003.

**IPR2014-01507**

38.     On March 30, 2015, the Patent Trial and Appeal Board ("PTAB") of the United States Patent and Trademark Office instituted an *Inter Partes* Review ("IPR") of the '870 patent.

39.     On June 22, 2015, Zipit filed its "Patent Owner's Response Under 37 C.F.R. § 42.120." Exhibit "E."

40.     On March 29, 2016, the PTAB issued a Final Decision that confirmed the patentability of all claims of the '870 Patent in IPR2014-01507. Exhibit "F."

41.     All papers and pleadings filed with the PTAB for IPR2014-01507 are part of the prosecution history of the '870 Patent. Due to their size and volume, the papers and pleadings filed with the PTAB for IPR2014-01507 are incorporated herein by reference.

**IPR2019-01567**

42.     On August 30, 2019, Defendant filed a Petition For *Inter Partes* Review of the '870 Patent.

43.     On December 10, 2019, Zipit filed a Preliminary Response to Defendant's Petition, requesting the PTAB to deny Defendant's Petition. Exhibit "V," 870 POPR.

44.     On information and belief, the PTAB should issue its Institution Decision regarding Defendant's Petition in March 2020.

## No Claim Of Zipit's '870 Patent Is Abstract

45.     The claims of the '870 Patent are focused on an advance over the prior art such that their character as a whole is not directed to excluded subject matter, such as an abstract idea, or any other subject matter excluded under 35 U.S.C. §101.  For example, the claims of the '870 patent are directed to improvements in computer functionality.

46.     The PTAB determined that the combinations claimed in the claims of the '870 Patent were novel and nonobvious, as did the Patent Office during its initial review of the claims. *See, e.g.*, Exhibit "B" and Exhibit "F."

47.     The advancement claimed in the claims of the '870 Patent includes, *inter alia*, an instant messaging terminal and method that includes a housing, a display mounted in the housing, a data entry device that affords the generation of textual characters and graphical symbols, a wireless Internet protocol communications module, a wireless transceiver, and a control module that includes a processor for executing an application program to implement instant messaging and session protocols for a conversation.  Such a claimed combination does not exist in the prior art.  Such a combination was not well-understood, routine, or conventional. And such a combination constitutes a tangible, specific, concrete invention.  The claimed combination also improved the operation of computer functionality, overcoming various failures with existing computing devices as discussed in the Background of the Invention and the Summary of the Invention.

48.     For example, providing the claimed combination in a handheld terminal (as opposed to a desktop, laptop, or PDA requiring external peripheral data entry and/or display devices) represented a significant advance in computer functionality, including allowing both

14

textual characters and graphical symbols to be entered/generated using a data entry device integrated into the handheld terminal.  This avoided the need for a platform to support the data entry device during data entry.  Furthermore, the claimed data entry device for generating/entering textual characters and graphical symbols improved the efficiency of computing devices by allowing graphical symbols to be directly entered by a user, avoiding the need for the computing device to translate a sequence of textual characters into a graphical symbol prior to displaying and sending the graphical symbol.

49.    The advancement claimed in the claims of the '870 Patent further includes, *inter alia*, an instant messaging terminal and method that, after loss of a network connection, automatically searches for a new connection and displays the conversation histories that were active when the network connection was lost.  Such a claimed combination does not exist in the prior art.  Such a combination was not well-understood, routine, or conventional.  And such a combination constitutes a tangible, specific, concrete invention.  Indeed, such functionality would have run counter to the state of the art due to concerns about the impact of battery life. This claimed capability represented a significant advance in computer functionality.  For example, the claimed capability does not depend on user instruction to locate a connection after connection loss.  Moreover, the claimed capability of displaying active conversation histories for active conversations terminated by loss of network connection improves upon the state of the art, in which such conversation histories were typically lost upon termination of the user's network connection.

50.    The advancement claimed in the claims of the '870 Patent further includes, *inter alia*, an instant messaging terminal and method that includes a plurality of keys for graphical

symbols, each graphical symbol key including indicia identifying the graphical symbol generated by depressing the key bearing the indicia. Such a claimed combination does not exist in the prior art. Such a combination was not well-understood, routine, or conventional. And such a combination constitutes a tangible, specific, concrete invention. This claimed feature also relates to the improvement in the efficiency of computing devices discussed above allowing graphical symbols to be directly entered by a user, avoiding the need for the computing device to translate a sequence of textual characters into a graphical symbol prior to displaying and sending the graphical symbol.

51. The advancement claimed in the claims of the '870 Patent further includes, *inter alia*, an instant messaging terminal and method that includes at least one programmable key associated with a set of characters corresponding to a graphical symbol supported by an instant messaging service provider. Such a claimed combination does not exist in the prior art. Such a combination was not well-understood, routine, or conventional. And such a combination constitutes a tangible, specific, concrete invention. This claimed feature also relates to the improvement in the efficiency of computing devices discussed above allowing graphical symbols to be directly entered by a user, avoiding the need for the computing device to translate a sequence of textual characters into a graphical symbol prior to displaying and sending the graphical symbol.

52. The advancement claimed in the claims of the '870 Patent further includes, *inter alia*, an instant messaging terminal and method that includes a control module that stores a profile containing network settings for a network communicating with the communications module and the wireless transceiver through an access point. Such a claimed combination does

16

not exist in the prior art.  Such a combination was not well-understood, routine, or conventional.  And such a combination constitutes a tangible, specific, concrete invention.  This claimed capability further improves computer operation because it permits, for example, the handheld terminal to connect automatically to a network corresponding to a store profile without user intervention.  *See* Exhibit "A," '870 Patent at 5:20-31.

53.     The advancement claimed in the claims of the '870 Patent further includes, *inter alia*, an instant messaging terminal and method that includes a control module that includes an audio player for generating sound from a downloaded file.  Such a claimed combination does not exist in the prior art.  Such a combination was not well-understood, routine, or conventional.  And such a combination constitutes a tangible, specific, concrete invention.  Moreover, the provision of this capability in the claimed handheld terminal improved the operation of existing handheld terminals by, for example, allowing users to listen to music while exchanging instant messages (including generating/entering textual characters and graphical symbols using the data entry device) using a single handheld terminal.

54.     The advancement claimed in the claims of the '870 Patent further includes, *inter alia*, an instant messaging terminal and method that includes a control module that generates sound from files received from an Internet radio station through a wireless, Internet protocol access point.  Such a claimed combination does not exist in the prior art.  Such a combination was not well-understood, routine, or conventional.  And such a combination constitutes a tangible, specific, concrete invention.  The provision of this capability in the claimed handheld terminal improved the operation of existing handheld terminals by, for example, allowing users to listen to sound files from an Internet radio station while exchanging instant messages

17

(including generating/entering textual characters and graphical symbols using the data entry device) using a single handheld terminal.

### The Inventions Claimed In The '870 Patent Were Not Well-Understood, Routine, Or Conventional

55.     Prior to Zipit's invention, instant messaging primarily transpired with desktop computers.

56.     Prior to Zipit's invention, text messages were sent over a carrier's cellular network using SMS.  Users sending and receiving text messages typically were charged for each text, including at rates of $0.20/text or $20/month.

57.     Zipit's technology allowed instant messaging by a handheld instant messaging terminal using Wi-Fi, avoiding the expense of texting and the need to share a desktop computer for instant messaging.

58.     Zipit's patented and claimed technology allowed mobile handheld devices to directly connect to a Wi-Fi access point without using an intermediate protocol in order to send instant messages comprising an emoji / graphical symbol (☺, ☹) over Wi-Fi, instead of the cellular network.

59.     No claims of the '870 Patent are unpatentable under §103.  *See, e.g.*, Exhibit "B" and Exhibit "F."  In addition, the patentability of the claims of the '870 Patent is confirmed by the overwhelming evidence of widespread acclaim that Patentee's "Zippy" and "Z2" devices received.  Due to the several awards, newspaper stories, television stories, and online articles regarding Zipit's "Zippy" and "Z2" devices, including for example: (i) Time Magazine's "The Most Amazing Inventions of 2005" Award, which was awarded to Zipit Wireless, Inc. for its

"Zippy" device, (ii) the 2005 Chicago Tribune article, which declares that "Zipit Is King Of Messengers," and (iii) PC Magazine's "Winner" of its 2007 "Best of Show" award in the category of "Portable Gear," which was awarded to Zipit for its "Z2" device, Zipit's patented "Zippy" and "Z2" devices received widespread acclaim.  Exhibit "G."

60.    A nexus exists between Zipit's "Zippy" device and the claims of the '870 Patent. Exhibits "E," "G," and "V."

61.    A nexus also exists between Zipit's acclaimed "Z2" device and the claims of the '870 Patent.  Exhibits "E," "G," and "V."

### Zipit's U.S. Patent No. 7,894,837 Patent

62.    On February 22, 2011, the United States Patent and Trademark Office duly and legally issued United States Patent No. 7,894,837, entitled "Instant Messaging Terminal Adapted For Wireless Communication Access Points."  A true and correct copy of U.S. Patent No. 7,894,837 is attached hereto as Exhibit "H."

63.    Zipit is the owner, by assignment, of all right, title, and interest in and to U.S. Patent No. 7,894,837 (hereinafter the "'837 Patent"), including the right to sue for past, present, and future patent infringement, and to collect past, present, and future damages.

64.    The '837 Patent complies with the Patent Act, including 35 U.S.C. §101, 35 U.S.C. §102, 35 U.S.C. § 103, and 35 U.S.C. §112.  Exhibit "I."

65.    Each and every claim of the '837 Patent is valid and enforceable.

66.    The '837 patent and its claims are entitled to the benefit of the filing date of the '870 patent (May 14, 2004) and also the date upon which Zipit filed its provisional patent application (December 23, 2003).  Exhibit "D."

19

67.     As the invention(s) claimed in the '837 patent were conceived no later than April 2003, the claims of the '837 patent are further entitled to a priority date of no later than April 2003.

## IPR2014-01506

68.     On March 30, 2015, the PTAB instituted an IPR of the '837 patent.

69.     On June 22, 2015, Zipit filed its "Patent Owner's Response Under 37 C.F.R. §42.120."  Exhibit "J."

70.     On March 29, 2016, the PTAB issued a Final Decision that confirmed the patentability of all claims of the '837 Patent in IPR2014-01506.  Exhibit "K."

71.     All papers and pleadings filed with the PTAB for IPR2014-01506 are part of the prosecution history of the '837 Patent.  Due to their size and volume, the papers and pleadings filed with the PTAB for IPR2014-01506 are incorporated by reference.

## IPR2019-01568

72.     On August 30, 2019, Defendant filed a Petition For *Inter Partes* Review of the '837 Patent.

73.     On December 10, 2019, Zipit filed a Preliminary Response to Defendant's Petition, requesting the PTAB to deny Defendant's Petition.  Exhibit "W," 837 POPR.

74.     On information and belief, the PTAB should issue its Institution Decision regarding Defendant's Petition in March 2020.

### Zipit's '837 Patent Is Not Abstract

75.     The claims of the '837 Patent are focused on an advance over the prior art such that their character as a whole is not directed to excluded subject matter, such as an abstract idea, or any other subject matter excluded under 35 U.S.C. §101.

76.     In fact, the PTAB determined that the combinations claimed in the claims of the '837 Patent were novel and nonobvious, as did the Patent Office during its initial review of the claims.  *See, e.g.*, Exhibit "I" and Exhibit "K."

77.     The advancement claimed in the claims of the '837 Patent includes, *inter alia*, an instant messaging terminal and method that includes a housing, a display mounted in the housing, a data entry device that affords the generation of textual characters and graphical symbols, a wireless Internet protocol communications module, a wireless transceiver, and a control module that includes a processor for executing an application program to implement instant messaging and session protocols for a conversation.  Such a claimed combination does not exist in the prior art.  Such a combination was not well-understood, routine, or conventional.  And such a combination constitutes a tangible, specific, concrete invention.  The claimed combination also improved the operation of computer functionality, overcoming various failures with existing computing devices as discussed in the Background of the Invention and the Summary of the Invention.

78.     For example, providing the claimed combination in a handheld terminal (as opposed to a desktop, laptop, or PDA requiring external peripheral data entry and/or display devices) represented a significant advance in computer functionality, including generation of both textual characters and graphical symbols using a data entry device integrated into the

handheld terminal.  This avoided the need for a platform to support the data entry device during

data entry.  Furthermore, the claimed data entry device for generating textual characters and

graphical symbols improved the efficiency of computing devices by allowing graphical symbols

to be directly entered by a user, avoiding the need for the computing device to translate a

sequence of textual characters into a graphical symbol prior to displaying and sending the

graphical symbol.

79.    The advancement claimed in the claims of the '837 patent further includes, *inter*

*alia*, an instant messaging terminal and method that includes a housing, a display mounted in the

housing, a data entry device that affords the generation of textual characters and graphical

symbols, a wireless Internet protocol communications module, a wireless transceiver, and a

control module that includes a processor for executing an application program to implement at

least one instant messaging protocol for generation of instant messaging data messages that are

compatible with an instant messaging service.  Such a claimed combination does not exist in the

prior art.  Such a combination was not well-understood, routine, or conventional.  And such a

combination constitutes a tangible, specific, concrete invention.  The claimed combination also

improved the operation of computer functionality, overcoming various failures with existing

computing devices as discussed in the Background of the Invention and the Summary of the

Invention.

80.    For example, providing the claimed combination in a handheld terminal (as

opposed to a desktop, laptop, or PDA requiring external peripheral data entry and/or display

devices) represented a significant advance in computer functionality, including generation of

both textual characters and graphical symbols using a data entry device integrated into the

handheld terminal. This avoided the need for a platform to support the data entry device during data entry. Furthermore, the claimed data entry device for generating textual characters and graphical symbols improved the efficiency of computing devices by allowing graphical symbols to be directly entered by a user, avoiding the need for the computing device to translate a sequence of textual characters into a graphical symbol prior to displaying and sending the graphical symbol.

81.     The advancement claimed in the claims of the '837 Patent further includes, *inter alia*, an instant messaging terminal and method that includes a plurality of keys for graphical symbols, each graphical symbol key including indicia identifying the graphical symbol generated by depressing the key bearing the indicia. Such a claimed combination does not exist in the prior art. Such a combination was not well-understood, routine, or conventional. And such a combination constitutes a tangible, specific, concrete invention. This claimed feature also relates to the improvement in the efficiency of computing devices discussed above allowing graphical symbols to be directly entered by a user, avoiding the need for the computing device to translate a sequence of textual characters into a graphical symbol prior to displaying and sending the graphical symbol.

82.     The advancement claimed in the claims of the '837 Patent further includes, *inter alia*, an instant messaging terminal and method that includes at least one programmable key associated with a set of characters corresponding to a graphical symbol supported by an instant messaging service provider. Such a claimed combination does not exist in the prior art. Such a combination was not well-understood, routine, or conventional. And such a combination constitutes a tangible, specific, concrete invention. This claimed feature also relates to the

improvement in the efficiency of computing devices discussed above allowing graphical symbols to be directly entered by a user, avoiding the need for the computing device to translate a sequence of textual characters into a graphical symbol prior to displaying and sending the graphical symbol.

83.     The advancement claimed in the claims of the '837 Patent further includes, *inter alia*, an instant messaging terminal and method that includes a control module to generate, in accordance with the at least one instant messaging protocol being implemented, a character sequence corresponding to a graphical symbol in response to the depression of the programmable key being depressed.  Such a claimed combination does not exist in the prior art.  Such a combination was not well-understood, routine, or conventional.  And such a combination constitutes a tangible, specific, concrete invention.  This claimed feature also relates to the improvement in the efficiency of computing devices discussed above allowing graphical symbols to be directly entered by a user, avoiding the need for the computing device to translate a sequence of textual characters into a graphical symbol prior to displaying and sending the graphical symbol.

84.     The advancement claimed in the claims of the '837 Patent further includes, *inter alia*, an instant messaging terminal and method that includes a control module that detects beacons received by the wireless transceiver from a plurality of wireless network access points and prioritizes the detected beacons by strength of detected signal.  Such a claimed combination does not exist in the prior art.  Such a combination was not well-understood, routine, or conventional.  And such a combination constitutes a tangible, specific, concrete invention.  This claimed capability improved the operation of a computing device because it, for example,

24

facilitates connection to the strongest wireless network access point, thereby optimizing speed and reliability of instant messaging.

85.     The advancement claimed in the claims of the '837 Patent further includes, *inter alia*, an instant messaging terminal and method that includes a control module that stores a profile containing network settings for a network communicating with the communications module and the wireless transceiver through an access point in memory. Such a claimed combination does not exist in the prior art.  Such a combination was not well-understood, routine, or conventional.  And such a combination constitutes a tangible, specific, concrete invention.  This claimed capability further improves computer operation because it permits, for example, the handheld terminal to connect automatically to a network corresponding to a store profile without user intervention.  *See* '837 patent at 5:5-15.

86.     The advancement claimed in the claims of the '837 Patent further includes, *inter alia*, an instant messaging terminal and method that includes a control module that includes an audio player for generating sound from a downloaded file.  Such a claimed combination does not exist in the prior art.  Such a combination was not well-understood, routine, or conventional.  And such a combination constitutes a tangible, specific, concrete invention.  Moreover, the provision of this capability in the claimed handheld terminal improved the operation of existing handheld terminals by, for example, allowing users to listen to music while exchanging instant messages (including generating/entering textual characters and graphical symbols using the data entry device) using a single handheld terminal.

87.     The advancement claimed in the claims of the '837 Patent further includes, *inter alia*, an instant messaging terminal and method that includes a control module that generates

sound from files received from an Internet radio station through a wireless, Internet protocol access point. Such a claimed combination does not exist in the prior art.  Such a combination was not well-understood, routine, or conventional.  And such a combination constitutes a tangible, specific, concrete invention.  The provision of this capability in the claimed handheld terminal improved the operation of existing handheld terminals by, for example, allowing users to listen to sound files from an Internet radio station while exchanging instant messages (including generating/entering textual characters and graphical symbols using the data entry device) using a single handheld terminal.

### The Inventions Claimed In The '837 Patent Were Not Well-Understood, Routine, Or Conventional

88.     Prior to Zipit's invention, handheld devices only allowed SMS text messaging over a carrier's cellular network.

89.     Prior to Zipit's invention, text messages were sent over a carrier's cellular network using SMS.  Users sending and receiving text messages typically were charged for each text, including at rates of $0.20/text or $20/month.

90.     Zipit's technology allowed instant messaging by a handheld mobile device using Wi-Fi, avoiding the expense of texting and the need to share a desktop computer for instant messaging.

91.     Zipit's patented and claimed technology allowed mobile handheld devices to directly connect to a Wi-Fi access point without using an intermediate protocol in order to send instant messages comprising an emoji / graphical symbol (☺, ☹) over Wi-Fi, instead of the cellular network.

92.     No claims of the '837 Patent are unpatentable under §103.  *See, e.g.*, Exhibit "I" and Exhibit "K."  In addition, the patentability of the claims of the '837 Patent is confirmed by the overwhelming evidence of widespread acclaim that Patentee's "Zippy" and "Z2" devices received.  Due to the several awards, newspaper stories, television stories, and online articles regarding Zipit's "Zippy" and "Z2" devices, including for example (i) Time Magazine's "The Most Amazing Inventions of 2005" Award, which was awarded to Zipit Wireless, Inc. for its "Zippy" device, (ii) the 2005 Chicago Tribune article, which declares that "Zipit Is King Of Messengers," and (iii) PC Magazine's "Winner" of its 2007 "Best of Show" award in the category of "Portable Gear," which was awarded to Zipit for its "Z2" device, Zipit's "Zippy" and "Z2" devices received widespread acclaim.  Exhibit "G."

93.     A nexus exists between Zipit's "Zippy" device and the claims of the '837 Patent. Exhibits "G," "J," and "W."

94.     A nexus also exists between Zipit's acclaimed "Z2" device and the claims of the '837 Patent.  Exhibits "G," "J," and "W."

**Zipit's Foreign Patents**

95.     Zipit also has been awarded related foreign patents.  In Europe (including Germany, Great Britain, and France), Zipit was awarded EP 1747619B1.  Exhibit "L."  In Japan, Zipit was awarded JP 5031556.  Exhibit "M."  And in Australia, Zipit was awarded AU 2009251161 B2.  Exhibit "N."

**Zipit's Past Litigation**

96.     The two instituted IPRs referenced above were initiated by BlackBerry

Corporation and BlackBerry Limited (collectively "BlackBerry").  Prior to the institution of the

two IPRs, Zipit filed suit against BlackBerry for infringement of Zipit's '870 and '837 Patents.

97.     After the patentability / validity of all claims in Zipit's '870 and '837 patents were

confirmed by the PTAB, Zipit and BlackBerry entered into a license and settlement agreement.

98.     Zipit subsequently filed suit against Samsung Electronics Co., Ltd., Samsung

Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively

"Samsung") for Samsung's infringement of Zipit's '870 and '837 Patents.

99.     The *Zipit-Samsung* lawsuit was terminated after Samsung became a licensee of

Zipit's '870 and '837 patents.

**DEFENDANT'S INFRINGING INSTANT MESSAGING DEVICES**

100.     On information and belief, Defendant has and continues to offer for sale, sell, use,

and import into the United States and New Jersey smartphones with Wi-Fi capability that send

and receive instant messages comprising an emoji / graphical symbol (☺, ☹) ("Defendant's

infringing instant messaging devices").

101.     Some of Defendant's representative infringing instant messaging devices include,

but are not limited to:

| Model Name | Release Date |
|---|---|
| Revolution / Tegra 2 / VS910 | 2011 May |
| Optimus 2X | 2011 February |
| Optimus Black P970 | 2011 May |
| Optimus Me P350 | 2011 February |

| | |
|---|---|
| Optimus Chat C550 | 2011 February |
| Optimus 3D P920 | 2011 July |
| Thrill 4G P925 | 2011 August |
| Thrive P506 | 2011 April |
| Phoenix P505 | 2011 April |
| US760 Genesis | 2011 June |
| Optimus Pro C660 | 2011 September |
| Optimus White | 2011 July |
| Marquee (Sprint) / Majestic (US Cellular) | 2011 October |
| Esteem MS910 / Bryce | 2011 October |
| Optimus Net / Optimus Net P699 / Optimus Link P690 | 2011 July |
| Optimus Net Dual / Optimus Net Dual P698 | 2011 Q3 |
| Optimus Sol E730 | 2011 September |
| Optimus Hub E510 | 2011 October |
| Optimus Slider / LS700 / Gelato Q | 2011 October |
| Jil Sander Mobile | 2011 October |
| Enlighten VS700 | 2011 September |
| DoublePlay / Flip II / C729 | 2011 October |
| Extravert VN271 | 2011 November |
| Optimus 2 AS680 | 2011 Q4 |
| Nitro HD / P930 | 2011 December |
| Prada 3.0 / Prada K2 / P940 | 2012 January |
| Spectrum VS920 / Revolution 2 | 2012 January |
| Viper 4G LTE LS840 | 2012 April |
| Connect 4G MS840 | 2012 February |
| Rumor Reflex LN272 | 2012 March |
| Optimus L3 E400 | 2012 February |
| Optimus L5 E610 | 2012 June |
| Optimus L7 P700 | 2012 May |
| Optimus 3D Max P720 | 2012 May |

| | |
|---|---|
| Optimus 4X HD P880 | 2012 June |
| Optimus M+ MS695 | 2012 April |
| Lucid 4G VS840 / Cayman / Optimus Exceed | 2012 April |
| Optimus True HD LTE P936 / Maximo True HD LTE | 2012 May |
| Optimus L3 E405 | 2012 July |
| Optimus Vu P895 | 2012 November |
| Motion 4G MS770 (MetroPCS) / Optimus Regard (Cricket Wireless) | 2012 August |
| Optimus L9 P760 | 2012 November |
| Optimus L5 Dual E615 | 2012 September |
| Escape P870 | 2012 September |
| Splendor US730 / Snapshot | 2012 September |
| Intuition VS950 | 2012 September |
| Optimus G E975 | 2012 November |
| Optimus G LS970 / Eclipse 4G LTE | 2012 Q4 |
| Optimus G E970 | 2012 November |
| Optimus L9 P769 | 2012 November |
| Mach LS860 / Cayenne | 2012 December |
| Spectrum II 4G VS930 / Revolution 2 | 2012 October |
| Nexus 4 E960 / Nexus 4 / Mako | 2012 November |
| Optimus L1 II E410 | 2013 April |
| Optimus L3 II E430 | 2013 April |
| Optimus L3 II Dual E435 | 2013 April |
| Optimus L5 II E460 | 2013 April |
| Optimus L5 II Dual E455 / Optimus Duet | 2013 April |
| Optimus L7 II P710 | 2013 March |
| Optimus L7 Dual P715 | 2013 March |
| Optimus G Pro E985 | 2013 April |
| Optimus F5 | 2013 May |
| Optimus F6 | 2013 September |

| | |
|---|---|
| Optimus F7 | 2013 June |
| Lucid2 VS870 | 2013 April |
| Optimus F3 | 2013 June |
| Optimus Zone VS410 | 2013 June |
| Optimus L4 II E440 | 2013 July |
| Optimus L4 Dual E445 | 2013 July |
| Optimus GJ E975W | 2013 June |
| Enact VS890 | 2013 August |
| Optimus L9 II | 2013 October |
| G2 | 2013 September |
| Optimus L2 E435 | 2014 March |
| G Pro Lite Dual | 2013 November |
| G Pro Lite | 2013 November |
| G Flex | 2013 November |
| Nexus 5 | 2013 November |
| LG Optimus F3Q | 2014 January |
| Optimus L1 II Tri E475 | 2014 February |
| Optimus L4 II Tri E470 | 2013 October |
| G Pro 2 | 2014 April |
| L40 Dual D170 | 2014 May |
| Optimus Fuel L34C | 2014 February |
| L45 Dual X132 | 2014 |
| L70 Dual D325 | 2014 May |
| L70 D320N | 2014 February |
| L90 D405 | 2014 March |
| L90 Dual D410 | 2014 April |
| G2 Mini | 2014 April |
| G2 Mini LTE | 2014 March |
| F70 D315 | 2014 May |
| L65 Dual D285 | 2014 May |

| Lucid 3 VS876 | 2014 April |
| L80 Dual | 2014 May |
| L80 | 2014 Q2 |
| Volt | 2014 May |
| L35 | 2014 June |
| G3 | 2014 June |
| L65 D280 | 2014 June |
| G3 S / D725 | 2014 August |
| G3 S Dual | 2014 August |
| G3 LTE-A | 2014 July |
| L20 | 2014 July |
| L30 | 2014 June |
| L50 | 2014 July |
| G Vista | 2014 August |
| L Fino | 2014 September |
| L Bello | 2014 September |
| G3 Stylus | 2014 October |
| L60 Dual | 2014 August |
| L60 | 2014 August |
| F60 | 2014 October |
| G3 Screen | 2014 December |
| G3 Dual LTE | 2014 November |
| Tribute | 2014 October |
| G Flex2 | 2015 February |
| Joy | 2015 May |
| Leon | 2015 April |
| Spirit | 2015 March |
| Magna | 2015 May |
| G4 Stylus | 2015 May |
| G Stylo | 2015 May |

| G4 | 2015 April |
| G4 Dual | 2015 April |
| G4c | 2015 June |
| G4 Beat | 2015 August |
| Bello II | 2015 September |
| Tribute 2 | 2015 July |
| Wine Smart | 2015 September |
| Zero / Class | 2015 October |
| Nexus 5X | 2015 October |
| V10 | 2015 October |
| G Vista 2 | 2015 November |
| Ray | 2016 January |
| K7 | 2016 February |
| K8 | 2016 April |
| G5 | 2016 April |
| K3 | 2016 September |
| Stylo 2 | 2016 April |
| Stylus 2 Plus | 2016 July |
| X power | 2016 September |
| X mach | 2016 September |
| X max | 2016 December |
| X5 | 2016 August |
| X skin | 2016 August |
| V20 | 2016 October |
| U | 2016 November |
| K3 | 2017 April |
| K4 (2017) / Phoenix 3 | 2017 March |
| K8 (2017) | 2017 April |
| K10 (2017) | 2017 February |
| K20 Plus | 2016 December |

| | |
|---|---|
| Harmony | 2017 April |
| Stylus 3 / Stylo 3 | 2017 March |
| Stylo 3 Plus | 2017 May |
| X Charge | 2017 June |
| G6 | 2017 March |
| X venture | 2017 May |
| Q6/Q6a | 2017 August |
| Q8 | 2017 August |
| V30/V30+ | 2017 September |
| Aristo 2 | 2018 January |
| K8 (2018) | 2018 February |
| K10+/K10a (2018) | 2018 February |
| V30S ThinQ/V30S+ ThinQ | 2018 March |
| LG Signature Edition | 2018 July |
| LG X4/X4+ | 2018 March |
| LG K9 | 2018 March |
| LG K30 | 2018 May |
| LG Q7/Q7+/Q7a | 2018 June |
| LG V35 ThinQ/V35+ ThinQ | 2018 May |
| LG Stylo 4 | 2018 July |
| LG X2 | 2018 June |
| LG K11+ | 2018 July |
| LG G7/G7 Fit/ G7 One | 2018 May |
| LG Candy | 2018 August |
| LG V40 ThinQ | 2018 October |
| LG Q9/Q9 One | 2019 December |
| LG Q8 ThinQ/G8s ThinQ | 2019 August |
| LG Q60 | 2019 November |
| LG K50 | 2019 February |
| LG K40 | 2019 December |

| LG V50 ThinQ 5G/V50S ThinQ 5G | 2019 May |
| LG K12+ | 2019 October |
| LG X6 | 2019 November |
| LG W30/W30 Pro | 2019 June |
| LG W10 | 2019 June |
| LG Stylo 5 | 2019 August |
| LG X2 (2019) | 2019 August |
| LG K30 (2019) | 2019 October |
| LG K40S | 2019 August |
| LG K50S | 2019 August |
| LG Q70 | 2019 October |
| LG G8X ThinQ | 2019 November |
| LG V50S ThinQ 5G | 2019 September |

102.    Defendant's infringing instant messaging devices are specifically designed to: (i) use an Android operating system; (ii) run an instant messaging application; (iii) send and receive instant messages; (iv) access the Google Play store; and (v) download an instant messaging application.

103.    Some of Defendant's infringing instant messaging devices are smartphones that are preloaded with one or more instant messaging application that is able to, and does, send an instant message comprising an emoji / graphical symbol (☺, ☹) over Wi-Fi.  Defendant provides its customers and potential customers with instructions on how to use these instant messaging devices in the United States and in New Jersey.  For example, such instructions exist in user manuals.  Exhibits "O" and "P."

104.     Some of Defendant's infringing instant messaging devices are smartphones that are Wi-Fi capable that are not preloaded with an instant messaging application.  Instead of preloading an instant messaging application on the smartphone, Defendant instructs its customers to download an instant messaging application from an application store, such as for example Google Play store.  Defendant provides its customers and potential customers with instructions on how to use these instant messaging devices in the United States.  For example, such instructions exist in user manuals.  Exhibits "O" and "P."

105.     On information and belief, Defendant's infringing instant messaging devices are smartphones that have been and continue to be offered for sale, sold, used, and imported into the United States and New Jersey preloaded with an instant messaging application, such as for example, "Hangouts."  The "Hangouts" application allows Defendant's smartphones to send instant messages comprising an emoji / graphical symbol (☺, ☹) over Wi-Fi.

106.     On information and belief, Defendant knowingly and intentionally encourages end users to download third party instant messaging applications onto one or more of Defendant's smartphones so that an end user is able to use one or more of Defendant's smartphones to send instant messages comprising an emoji / graphical symbol (☺, ☹) over Wi-Fi.  On information and belief, some of these third-party instant messaging applications also may be preloaded onto Defendant's smartphones.  These instant messaging apps allow Defendant's smartphone to send instant messages comprising an emoji / graphical symbol over Wi-Fi.

107.     On information and belief, prior to 2017 Defendant's smartphones "used their own emoji images….":

36







Exhibit "Q."

108.   On information and belief, during and since 2017 Defendant's smartphones have and continue to use emojis.  Exhibit "R."

109.   On information and belief, Defendant's smartphones include keyboards and keys that bear an emoji / graphical symbol (☺, ☹) that is generated by pressing the key:





40



Exhibits "S," "O," and "P."

110.     On information and belief, Defendant is stealing Zipit's patented technology to illegally make money in the United States and in New Jersey.  On information and belief, Defendant illegally makes money by, for example, (i) selling smartphones that could not otherwise be sold if they were unable to send an instant message containing an emoji / graphical symbol (☺,☹) over a Wi-Fi connection; (ii) selling instant messaging applications that allow a smartphone to send an instant message containing an emoji / graphical symbol (☺,☹) over a Wi-Fi connection; (iii) selling advertisements that are displayed during an end user's use of an instant messaging application that is able to send an instant message containing an emoji / graphical symbol (☺,☹) over a Wi-Fi connection; (iv) selling features in an instant messaging

41

application that allows a smartphone to send an instant message containing an emoji / graphical symbol (☺,☹) over a Wi-Fi connection; and (v) selling information about end users who use an instant messaging application to send an instant message containing an emoji / graphical symbol (☺,☹) over a Wi-Fi connection.

## THE PARTIES' PRE-SUIT COMMUNICATIONS

111.    Zipit provided Defendant's predecessor in interest, LG Electronics Mobilecomm U.S.A., Inc., with written notice of infringement of Zipit's '870 and '837 Patents on or about July 26, 2018.  Exhibit "U."  That notice letter enclosed charts identical or substantially identical to Exhibits "O" and "P."

112.    Neither Defendant, nor its predecessor in interest, LG Electronics Mobilecomm U.S.A., Inc., responded to Zipit.

## COUNT ONE: PATENT INFRINGEMENT
### (U.S. Patent No. 7,292,870)

113.    Zipit realleges and incorporates herein the preceding allegations of this Complaint as if fully set forth herein.

114.    Defendant has in the past and continues to infringe one or more claims of the '870 Patent, including claims 20, 21, 24, 25, 26, 27, 28, 29, and 30 in violation of 35 U.S.C. §§271 (a), (b), and (c).  Representative infringement claim charts are attached as Exhibit "O."

115.    Defendant's infringing acts include, but are not necessarily limited to, Defendant's manufacture, use, offering for sale, sale, and importation of Wi-Fi-enabled instant messaging devices and methods, such as the above listed smartphones, that generate an instant message that includes an emoji / graphical symbol, such as ☺, ☹, ☺, using an instant messaging

application that was preloaded onto Defendant's Wi-Fi enabled smartphone by Defendant, such as "Hangouts," and/or using a third party instant messaging application that has been downloaded onto one of the Defendant's Wi-Fi enabled smartphones, as instructed.

116.   Defendant's infringing smartphones include, but are not limited to, the list of Defendant's smartphones set forth above.

117.   As a non-limiting, representative example, Defendant's G5 smartphones infringe claims 20, 21, 24, 25, 26, 27, 28, 29, and 30 of Zipit's '870 Patent because Defendant's G5 smartphones generate and send an instant message that includes an emoji / graphical symbol using Wi-Fi.  Exhibit "O."  Defendants' G5 smartphones further infringe claim 21 of Zipit's '870 Patent because Defendant's G5 smartphones comprise a specific key that has an emoji / graphical symbol (☺) that is generated by depressing the key:



Exhibit "O."   On information and belief, Defendant's G5 smartphones have been made, used, offered for sale, sold and/or imported into the United States and New Jersey since at least June 2012.

118.     Defendant has in the past and continues to indirectly infringe one or more claims of the '870 Patent in violation of 35 U.S.C. § 271(b) by actively, knowingly, and intentionally inducing direct infringement by other persons, including patrons, customers, and end users, by offering for sale and/or selling Defendant's Wi-Fi enabled instant messaging devices that generate an instant message that includes an emoji / graphical symbol, such as ☺, ☹, ☺, using one of Defendant's past or present instant messaging applications, and/or a third party instant messaging application, that has been loaded onto one of Defendant's Wi-Fi enabled instant messaging devices, such as an LGEUS smartphone, in the United States and New Jersey without authority or license from Zipit and in a manner understood and intended to infringe Zipit's '870 Patent.

119.     Defendant instructs customers and potential customers who reside in the State of New Jersey how to send an instant message comprising an emoji / graphical symbol, such as ☺, ☹, ☺, over Wi-Fi using one of Defendant's smartphones.  For example, such instructions are in the form of on-line content and user manuals.

120.     Defendant's parent LGEKR had actual knowledge of Zipit's '870 patent no later than December 31, 2009.  Exhibit "T."  On information and belief, LGEUS likewise had actual knowledge of Zipit's '870 patent at least as of that date as well.

121.     Zipit provided Defendant with written notice of the '870 Patent on or about July 26, 2018.  Exhibit "U."  At the same time, Zipit also told Defendant that Defendant has in the past infringed and is continuing to infringe the '870 Patent.  As a result, Defendant had notice of its alleged infringement of the '870 Patent no later than July 26, 2018.

122.    On information and belief, since receiving notice from Zipit on or about July 26, 2018, Defendant has not changed its course of conduct, Defendant has not changed its infringing products, Defendant has not changed its infringing processes, and Defendant has not changed any of its instructions or supporting literature and materials due to Zipit's '870 Patent.

123.    On information and belief, as Defendant deliberately avoided confirming its high probability of wrongdoing, Defendant has and continues to directly infringe, and induce the direct infringement of, one or more claims of the '870 Patent, with willful blindness.

124.    Defendant also has in the past and continues to indirectly infringe one or more claims of the '870 Patent, in violation of 35 U.S.C. § 271(c) by actively, knowingly, and intentionally contributing to an underlying direct infringement by other persons, such as Defendant's patrons, customers, and end users, by offering for sale and/or selling Defendant's Wi-Fi enabled instant messaging devices that generate an instant message that includes an emoji / graphical symbol, such as ☺, ☹, ☺, using one of Defendant's past or present instant messaging applications, and/or a third party instant messaging application, that has been loaded onto one of Defendant's Wi-Fi enabled instant messaging devices, such as an LGEUS smartphone, in the United States without authority or license from Zipit and in a manner understood and intended to infringe Zipit's '870 Patent.

125.    Defendant's Wi-Fi enabled instant messaging devices that generate an instant message that includes an emoji / graphical symbol, such as ☺, ☹, ☺, using one of Defendant's past or present instant messaging applications, and/or a third party instant messaging application, that has been loaded onto one of Defendant's Wi-Fi enabled instant messaging devices, such as

an LGEUS smartphone are (i) a component and material part of the inventions claimed in one or more claims of the '870 Patent, (ii) knowingly and especially designed for use in infringing one or more claims of the '870 Patent, (iii) intended to be used to infringe one or more claims of the '870 Patent, and (iv) not a staple item of commerce suitable for substantial non-infringing use.

126. On information and belief, as Defendant deliberately avoided confirming its high probability of wrongdoing, Defendant has and continues to infringe, and contribute to the direct infringement of one or more claims of the '870 Patent, with willful blindness.

127. Customers who reside in the State of New Jersey, and the District of New Jersey, may purchase Defendant's Wi-Fi enabled instant messaging devices that generate an instant message that includes an emoji / graphical symbol, such as ☺, ☹, ☺, using one of Defendant's past or present instant messaging applications, and/or a third party instant messaging application, that has been loaded onto one of Defendant's Wi-Fi enabled instant messaging devices, such as an LGEUS smartphone.

128. Defendant instructs customers and potential customers who reside in the State of New Jersey, and the District of New Jersey, how to send an instant message comprising an emoji / graphical symbol, such as ☺, ☹, ☺, over Wi-Fi using one of Defendant's smartphones.  For example, such instructions are in the form of on-line content and user manuals.

129. On information and belief, since receiving notice from Zipit on or about July 26, 2018, Defendant has not changed its course of conduct, Defendant has not changed its infringing products, Defendant has not changed its infringing processes, and Defendant has not changed any of its instructions or supporting literature and materials due to Zipit's '870 Patent.

130.    Defendant's infringement of the '870 Patent has been, and continues to be, objectively reckless, willful and deliberate, entitling Zipit to increased damages pursuant to 35 U.S.C. §284 and to attorneys' fees pursuant to 35 U.S.C. §285.

131.    Zipit has and continues to suffer damages as a direct and proximate result of Defendant's infringement of the '870 Patent and will suffer additional and irreparable damages unless Defendant is permanently enjoined by this Court from continuing its infringement.  Zipit has no adequate remedy at law.

132.    Zipit is entitled to: (i) damages adequate to compensate it for Defendant's infringement of the '870 Patent, which amounts to, at a minimum, a reasonable royalty; (ii) Zipit's lost profits; (iii) treble damages; (iv) attorneys' fees; (v) costs; and (vi) a preliminary and thereafter permanent injunction.

### COUNT TWO: PATENT INFRINGEMENT
**(U.S. Patent No. 7,894,837)**

133.    Zipit realleges and incorporates herein the preceding allegations of this Complaint as if fully set forth herein.

134.    Defendant has in the past and continues to infringe one or more claims of the '837 patent, including claims 11, 12, 14, 15, 16, and 20 in violation of 35 U.S.C. §§271 (a), (b), and (c).  Representative infringement claim charts are attached as Exhibit "P."

135.    Defendant's infringing acts include, but are not necessarily limited to, Defendant's manufacture, use, offering for sale, sale, and importation of Wi-Fi enabled instant messaging devices and methods, such as the above listed smartphones, that generate an instant message that includes an emoji / graphical symbol, such as ☺, ☹, ☺, using an instant messaging

47

application that was preloaded onto Defendant's Wi-Fi enabled smartphone by Defendant, such as "Hangouts," and/or using a third party instant messaging application that has been downloaded onto one of the Defendant's Wi-Fi enabled smartphones, as instructed.

136.    Defendant's infringing smartphones include, but are not limited to, the list of Defendant's smartphones set forth above.

137.    As a non-limiting example, Defendant's G5 smartphones infringe claims 11, 12, 14, 15, 16, and 20 of Zipit's '837 patent because they generate and send an instant message that includes an emoji / graphical symbol using Wi-Fi.  Defendant's G5 smartphones further infringe claim 12 of Zipit's '837 patent because they comprise a specific key that has an emoji / graphical symbol (☺) that is generated by pressing the key:



Exhibit "P."   On information and belief, Defendant's G5 smartphones have been made, used, offered for sale, sold, and/or imported into the United States and New Jersey since at least June 2012.

138.    Defendant has in the past and continues to indirectly infringe one or more claims of the '837 Patent, in violation of 35 U.S.C. § 271(b) by actively, knowingly, and intentionally

48

inducing direct infringement by other persons, including patrons, customers, and end users, by offering for sale and/or selling Defendant's Wi-Fi enabled instant messaging devices that generate an instant message that includes an emoji / graphical symbol, such as ☺, ☹, ☺, using one of Defendant's past or present instant messaging applications, and/or a third party instant messaging application, that has been loaded onto one of Defendant's Wi-Fi enabled instant messaging devices, such as an LGEUS smartphone, in the United States without authority or license from Zipit and in a manner understood and intended to infringe Zipit's '837 Patent.

139.    Defendant instructs customers and potential customers who reside in the State of New Jersey how to send an instant message comprising an emoji / graphical symbol, such as ☺, ☹, ☺, over Wi-Fi using one of Defendant's smartphones.  For example, such instructions are in the form of on-line content and user manuals.

140.    Zipit provided Defendant with written notice of the '837 Patent on or about July 26, 2018.  Exhibit "U."  At the same time, Zipit also told Defendant that Defendant has in the past infringed and is continuing to infringe the '837 Patent.  As a result, Defendant had notice of its alleged infringement of the '837 Patent no later than July 26, 2018.

141.    On information and belief, since receiving notice from Zipit on or about July 26, 2018, Defendant has not changed its course of conduct, Defendant has not changed its infringing products, Defendant has not changed its infringing processes, and Defendant has not changed any of its instructions or supporting literature and materials due to Zipit's '837 Patent.

142.    On information and belief, as Defendant deliberately avoided confirming its high probability of wrongdoing, Defendant has and continues to directly infringe, and induce the direct infringement of, one or more claims of the '837 Patent, with willful blindness.

49

143.    Defendant also has in the past and continues to indirectly infringe one or more claims of the '837 Patent, in violation of 35 U.S.C. § 271(c) by actively, knowingly, and intentionally contributing to an underlying direct infringement by other persons, such as Defendant's patrons, customers, and end users, by offering for sale and/or selling Defendant's Wi-Fi enabled instant messaging devices that generate an instant message that includes an emoji / graphical symbol, such as ☺, ☹, ☺, using one of Defendant's past or present instant messaging applications, and/or a third party instant messaging application, that has been loaded onto one of Defendant's Wi-Fi enabled instant messaging devices, such as an LGEUS smartphone, in the United States without authority or license from Zipit and in a manner understood and intended to infringe Zipit's '837 Patent.

144.    Defendant's Wi-Fi enabled instant messaging devices that generate an instant message that includes an emoji / graphical symbol, such as ☺, ☹, ☺, using one of Defendant's past or present instant messaging applications, and/or a third party instant messaging application, that has been loaded onto one of Defendant's Wi-Fi enabled instant messaging devices, such as an LGEUS smartphone are (i) a component and material part of the inventions claimed in one or more claims of the '837 Patent, (ii) knowingly and especially designed for use in infringing one or more claims of the '837 Patent, (iii) intended to be used to infringe one or more claims of the '837 Patent, and (iv) not a staple item of commerce suitable for substantial non-infringing use.

145.    On information and belief, as Defendant deliberately avoided confirming its high probability of wrongdoing, Defendant has and continues to infringe, and contribute to the direct infringement of one or more claims of the '837 Patent, with willful blindness.

50

146.    Customers who reside in the State of New Jersey, and the District of New Jersey, may purchase Defendant's Wi-Fi enabled instant messaging devices that generate an instant message that includes an emoji / graphical symbol, such as ☺, ☹, ☺, using one of Defendant's past or present instant messaging applications, and/or a third party instant messaging application, that has been loaded onto one of Defendant's Wi-Fi enabled instant messaging devices, such as an LGEUS smartphone.

147.    Defendant instructs customers and potential customers who reside in the State of New Jersey, and the District of New Jersey, how to send an instant message comprising an emoji / graphical symbol, such as ☺, ☹, ☺, over Wi-Fi using one of Defendant's smartphones.  For example, such instructions are in the form of on-line content and user manuals.

148.    On information and belief, since receiving notice from Zipit on or about July 26, 2018, Defendant has not changed its course of conduct, Defendant has not changed its infringing products, Defendant has not changed its infringing processes, and Defendant has not changed any of its instructions or supporting literature and materials due to Zipit's '837 Patent.

149.    Defendants' infringement of the '837 Patent has been, and continues to be, objectively reckless, willful and deliberate, entitling Zipit to increased damages pursuant to 35 U.S.C. §284 and to attorneys' fees pursuant to 35 U.S.C. §285.

150.    Zipit has and continues to suffer damages as a direct and proximate result of Defendant's infringement of the '837 Patent and will suffer additional and irreparable damages unless Defendant is permanently enjoined by this Court from continuing its infringement.  Zipit has no adequate remedy at law.

151.    Zipit is entitled to: (i) damages adequate to compensate it for Defendant's infringement of the '837 Patent, which amounts to, at a minimum, a reasonable royalty; (ii) Zipit's lost profits; (iii) treble damages; (iv) attorneys' fees; (v) costs; and (vi) a preliminary and thereafter permanent injunction.

## PRAYER FOR RELIEF

WHEREFORE, Zipit seeks the following relief:

a.      That Defendant be enjoined from further infringement of Zipit's '870 Patent and Zipit's '837 Patent pursuant to 35 U.S.C. §283;

b.      That Defendant be ordered to pay damages adequate to compensate Zipit for Defendant's infringement of Zipit's '870 Patent and Zipit's '837 Patent pursuant to 35 U.S.C. §284;

c.      That Defendant be ordered to pay Zipit Zipit's lost profits due to Defendant's infringement of Zipit's '870 Patent and Zipit's '837 Patent pursuant to 35 U.S.C. §284;

d.      That Defendant be ordered to pay Zipit treble damages pursuant to 35 U.S.C. §284;

e.      That Defendant be ordered to pay prejudgment interest pursuant to 35 U.S.C. §284;

f.      That Defendant be ordered to pay all costs associated with this action pursuant to 35 U.S.C. §284;

g.      That Defendant be ordered to pay Zipit's attorneys' fees pursuant to 35 U.S.C. §285;

h.      That Zipit be granted such other and additional relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Zipit demands a trial by jury of all issues triable of right by a jury.

Respectfully submitted, this 12th day of February, 2020.

HERMAN JONES LLP

*/s/ Serina M. Vash*

Serina M. Vash
 (NJ Bar. No. 041142009)
HERMAN JONES LLP
153 Central Avenue #131
Westfield, NJ 07090
Telephone: (862) 250-3930
Telephone: (404) 504-6516
Facsimile:  (404) 504-6501
Email: svash@hermanjones.com

Stephen R. Risley
(*pro hac vice application to be filed*)
KENT & RISLEY LLC
5755 North Point Parkway, Suite 57
Alpharetta, GA 30022
Telephone: (404) 585-2101
Facsimile: (678) 389-9402
Email: steverisley@kentrisley.com

Cortney S. Alexander
(*pro hac vice application to be filed*)
KENT & RISLEY LLC
5755 North Point Parkway, Suite 57
Alpharetta, GA 30022
Telephone: (404) 855-3867
Facsimile: (770) 462-3299
Email: cortneyalexander@kentrisley.com

Attorneys for Plaintiff
Zipit Wireless, Inc.